(155 App. Div. 486.)

### PEOPLE v. ELLIOTT.

(Supreme Court, Appellate Division, First Department.   March 7, 1913.)

1. FORGERY (§ 44*)—SUFFICIENCY OF EVIDENCE.

Evidence in a prosecution for forgery *held* sufficient to sustain a conviction.

[Ed. Note.—For other cases, see Forgery, Cent. Dig. §§ 117–121; Dec. Dig. § 44.*]

2. CRIMINAL LAW (§ 742*)—ACCOMPLICE—QUESTION FOR JURY.

Evidence in a prosecution for forgery *held* sufficient to make the question of whether a witness was an accomplice one for the jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1098, 1138, 1719–1721; Dec. Dig. § 742.*]

3. CRIMINAL LAW (§ 511*)—CORROBORATION OF ACCOMPLICE.

All the corroboration of an accomplice that is required is testimony tending to show the connection of defendant with the crime, and in a prosecution for forgery a letter claimed to have been written by defendant is properly admitted in evidence on the testimony of an accomplice who qualified as to knowledge of defendant's handwriting, and testified that the letter was in his handwriting, although his corroboration related to the commission of the crime, and not to the writing of the letter.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1127–1137; Dec. Dig. § 511.*]

Appeal from Trial Term, New York County.

James C. Elliott was convicted of forgery, and appeals.   Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Max D. Steuer, of New York City (Henry W. Unger, of New York City, of counsel), for appellant.

Charles S. Whitman, Dist. Atty., of New York City (Robert C. Taylor, of New York City, of counsel), for respondent.

CLARKE, J.   The indictment is in two counts, first, charging the forgery of a check on the Irving National Exchange Bank dated December 28, 1911, for $8,250 purporting to be drawn by the Woodhouse Manufacturing Company, D. W. Woodhouse, Prop., and, second, uttering the same knowing it to be forged.   The fact that the instrument was forged is conceded as well as proved.

One Chester Errico, who was also indicted, had been for some time in the employment of the Woodhouse Manufacturing Company as bookkeeper and cashier.   He was married, and had children.   He seems to have fallen into evil ways, to have become addicted to gambling and to the opium habit.   He consorted with a girl named Evelyn Curtis, who admitted that she had been twice convicted of soliciting. He spent considerable time with her.   The reason for this frequentation as stated by him was for the purpose of opium smoking.   There is no doubt that their relations were meretricious.   After the crime she went with him to Boston at 1 o'clock in the morning on the 29th of December, and there lived with him until about the middle of March, when he was arrested.

[1] Errico was the principal witness for the prosecution. He had pleaded guilty. He testified that through some considerable period prior to the 28th of December he had raised a number of checks of his employer, and had caused to be cashed a number of other checks, the signature to which he claimed to have been forged by a friend of his by the name of Edward Slattery, and that the amounts so feloniously obtained aggregated some $3,000. He strenuously denied that he had ever forged the signature on any of these checks, and makes a nice ethical distinction between procuring a check to be forged, the raising of a check, and the forgery of the signature itself. About the end of November, Errico lost his salaried position, but was still continued in the employment of the company with the privilege of making outside sales, with the right to receive commissions thereon. A new bookkeeper was to be installed and Errico feared that his peculations could no longer be concealed, but would be discovered upon examination of the books. During those preceding months the defendant, Elliott, and a woman friend also addicted to the opium habit, were intimates of Errico and the Curtis girl. Errico charges the defendant with inducting him into the habit. Errico testified that two weeks prior to the night of December 27th he told the defendant that he was in a bad way down at the office with the books. "He says to me, 'What do you expect to do?' I says, 'Well, they have got a new bookkeeper down there, and all the defalcations will come out now when he goes to draw a trial balance;' and he spoke up and said, 'Well, supposing you put another big check over,' he says, 'and you will not get any more for it than you will for the past that you have done.' * * * So finally I agreed to it, and I says to him, 'Well, what do you need?' He says, 'The only thing I will need is a model,' * * * so I got him a signature about two days afterwards."

The story told by both Errico and the Curtis woman is that on the afternoon of December 27th they were all at the Curtis woman's flat, and that the defendant left, saying he was going over to the house to get some pen points and things. Thereafter he came back again with a parcel. They continued to smoke opium, lying on the bed in her room. About 12 o'clock at night the defendant said it was time to get to work. He and Errico got up and went to work, while the woman stayed in her own room. This parcel was opened, and contained a check book with a number of checks and some pens. With the genuine check, the so-called model which Errico had given to the defendant, he went to work writing signatures on the checks. He kept at it for about two hours and a half. They were finally satisfied with one. Just at this time the ink bottle was upset, and the Curtis woman came out of her room to clean up the ink, and, according to her testimony, she saw Elliott write the last signature, which was pronounced satisfactory. There was discussion between Elliott and Errico as to the amount, and $8,250 was agreed upon. Errico filled in the amount and the number of the check. The signature was made by a rubber stamp impression of the Woodhouse Manufacturing Company, and under that stamp Woodhouse's written signature was put on by Elliott. The check was made out to cash. The next day about 11:30 o'clock Elliott met Errico at the Cur-

tis woman's flat and they went downtown. Errico had been in the habit of attending to the bank business of the Woodhouse Manufacturing Company, both in depositing and cashing checks, and, of course, was known at the bank. It was arranged that the attempt should be made at a time in the day when Mr. Woodhouse was away from his office; that Elliott should go to the office of the company "and cover the telephone," to watch whether there was any calling up from the bank in case there was trouble on account of the size of the check. This was carried out.

The present bookkeeper said that on the 28th of December, 1911, he saw the defendant come to the office between 12 and 1. o'clock. He asked if Mr. Woodhouse was in. "I told him he had gone to lunch. He stopped and thought a moment, and then he asked, 'Could I use your telephone?' I said, 'Yes; there it is, you can use it;' and he talked to some one for a few minutes. He called up some one, and was talking, and then he says, 'What's the number of this telephone?' I told him, and he says, 'Well, the party I want to talk to is out, so he will call me up here in a few minutes.' He waited around there for about 10 minutes for the man, and he says, 'I guess that party ain't going to call me up. I will come in again and see Mr. Woodhouse.' That was all, and then he went out."

The office of the Woodhouse Manufacturing Company is about three short blocks from the Irving National Exchange Bank. Errico presented the check at the bank and received six $1,000 bills, four $500's and five $50's, and shortly after coming out of the bank met Elliott who said, "Did you get the money?" "I says, 'I did.' He says, 'I can't hardly believe it.'" And they started in a devious way uptown, first redeeming a ring from a pawnbroker, and then buying a couple of dollars worth of opium. Elliott said, "Now, don't let nobody touch you for the money on the way up." Errico handed the money to Elliott, who slipped it into his glove, and they went back to the Curtis flat, where Elliott gave Errico one $1,000 bill, two $500's and five $50's, $2,250 in all. Later that night Elliott told Errico he had given $1,000 to his brother "to hold for me in case both of us drop, and we will have something to fight the case with." Errico says he got $600 more for the purpose of hiring an expert to fix up the books. Elliott kept the balance. Elliott and his brother insisted that he should take the Curtis woman "lest she should squeal" to Boston, and as a result he did take her to Boston on the 29th, where he laid up at the place indicated by Elliott. There he received letters from Elliott under an assumed name until he was arrested in March. The Curtis woman tells substantially the same story. The evidence is sufficient to require the conviction, if believed. The attempt of the defense was to establish by cross-examination that this story was concocted for the purpose of ameliorating the punishment that Errico was to receive, or perhaps to secure for him entire immunity by putting the crime on Elliott, and that, as by his own confession Errico had been engaged in these preceding forgeries, this tale of opium smoking and midnight forgery by Elliott, if not the entire product of imagination, is absolutely unbelievable, and that Errico was the sole criminal.

So far as the count for uttering is concerned, the appellant claims that, while there may be some evidence in the alleged identification of the bookkeeper and his testimony as to the defendant's presence in the office and hanging around the telephone at the time of the cashing of the check at the bank, yet it is not enough, that the cross-examination showed the impossibility of a real identification, and that it is so slight a circumstance that the jury ought to have been instructed to acquit, assuming that the other two witnesses, Errico and Curtis, were accomplices.

But there were other matters bearing on this count. When he was arrested the officer said:

"I says, 'I come here to lock you up.' He says, 'What for?' I says, 'They charge you of acting in concert with Errico, putting over that check for $8,250.' Q. What did he say to that? A. He says, 'I did not put it over.' Well, I says, 'They claim you wrote part of it.' He says, 'No; Errico wrote it all.'"

There was found on him a couple of little books. In one of them was the telephone number of the Woodhouse Manufacturing Company. In view of the testimony as to his presence there as a lookout on the day of the perpetration of the crime, that is significant.

[2] The important question is as to the status of Evelyn Curtis. The defendant claims that she was an accomplice, that the jury should have been so instructed as matter of law, and that without her testimony no conviction could be had; it being, of course, admitted that Errico was an accomplice in the crime of forgery. The court declined to charge that the Curtis woman was or was not an accomplice, but left it to the jury as a question of fact for them to determine, charging fully as follows:

"The defendant's counsel claims that the woman Curtis is an accomplice. * * * One who aids and abets in the commission of crime, one who advises, counsels, procures, or commands another to commit crime, is an accomplice. Now, was that woman an accomplice? Did she aid and abet in the commission of this crime? Did she procure the act to be done? Did she advise the act to be done? Did she counsel that to be done? Is there anything in this evidence that would bring her within the provisions of section 2 of the Penal Law, as I have read it to you? You let your memories go over the evidence from one end to the other. If you find anything in this evidence that she counseled the drawing of the check, or she advised it or procured it to be done, commanded it to be done, why then, of course, you would be justified in finding that she was an accomplice; but, if you cannot find any of those elements in it, you could not find she was an accomplice. She was just merely a witness, in other words, and her testimony need not be corroborated if she was a mere witness. It depends upon the intrinsic credibility of the testimony itself and of the woman herself. Now, she says that she was called in to wipe up the ink. She admits this illicit intercourse, etc. She admits the opium on the part of all of them, said they all smoked it, and they were all lying on her bed, etc., and she said that she went there and she spoke to the defendant and to Errico, and that neither of them answered what they were to do with the check, and, as she expresses it, 'what could she do?' The jury might argue to themselves, could the woman have prevented it, could that woman have prevented these men from forging a check if they wanted to? On the evidence as submitted, could she be made a party, could she have been made a defendant, either by her counseling or active participation in the act itself, could she have been made a party? If she could have been made a party, she would be an accomplice, and her

testimony would have to be corroborated.  I leave that entirely to you in regard to that."

She denied that prior to the transaction she had any knowledge of the intended crime or any participation therein; that while, having been called in at the time of the upsetting of the ink, she did see those checks, and did see Elliott sign, yet she did not know what the purpose was and had nothing to do with it.  Of course, she admits that after the perpetration of the crime she did go to Boston and did live with Errico on the proceeds thereof, but the district attorney claims that such facts, after the event, did not make her a principal and accessory before the fact or an accomplice, that at best she was an accessory after the fact, and that the test is, could she have been convicted if indicted herself for the forgery or uttering?

In People v. McGuire, 135 N. Y. 639, 32 N. E. 146,[1] a man and a woman were attempting to swear upon each other the perpetration of a murder.  The question came up as to the status of a third person named Brazington.  The court said:

"A distinct confession of his guilt [that is, McGuire's] made by him to Brazington was sworn to by the latter.  He cannot be regarded as an accomplice in the commission of the crime.  * * *  There is no evidence that he knew beforehand of the expedition to Gregory's on that day, or in any manner aided or abetted it.  There is proof that he had talked approvingly of a robbery, and even started once with McGuire to effect it, but he is in no manner connected with the actual offense committed except by his silence after he heard of it.  He says that McGuire confessed to him that he committed the crime, and gave him the $20 gold piece and some other money stolen from Gregory not to tell.  The prisoner's counsel calls the story improbable, and criticizes it as telling of a crime and then buying the listener's silence when it was easy not to tell at all.  But that is not a just criticism. What had previously passed between the two with reference to a robbery was quite enough, when it occurred, to enable Brazington to be sure that McGuire was the perpetrator.  The latter knew that the former would be confident of it, and a denial to him useless.  He took what seemed to him the safer course of telling him the truth and bribing him to silence.  So that neither the want of corroboration of Mrs. Brown's evidence nor the criticism upon Bazington's are well founded."

In People v. Zucker, 20 App. Div. 363, 46 N. Y. Supp. 766, affirmed on the opinion below, 154 N. Y. 770, 49 N. E. 1102, the appellant was convicted upon the testimony of a witness, Schernholz, of arson, who swore that he set fire to the premises, and that he was employed by Zucker to do so.  The question was as to the corroboration of the statements of this witness.  The court said:

"The record contains corroborating evidence, and it is to be found in the testimony of the witness Meyers, who swore to a conversation between himself and Zucker, the prisoner, which conversation took place at about the exact time the fire occurred.  * * *  It is claimed that this evidence is subject to the same criticism as that made of Schoenholz's, namely, that Meyers also was an accomplice.  I do not think that Meyers can be regarded as standing in that relation to Zucker.  He was not particeps criminis.  He was in no way connected with the crime itself.  He had nothing to do with its commission, was not concerned in it, but according to the testimony positively declined to take any part in it.  * * *  All that is to be said

---

[1] Reported in full in the Northeastern Reporter; reported as a memorandum decision without opinion in New York Reports.

concerning him is that he knew of the purpose of Zucker, and did not reveal it. Upon this state of facts, the court was asked to charge substantially that Meyers was an accomplice, and for that reason his evidence could not be used to corroborate the evidence of another accomplice, and that it could not be regarded as sufficient to convict unless it was corroborated. This the court refused, and to this refusal, which is now relied upon as error, exception was taken. To constitute an accomplice one must be so connected with a crime that at common law he might himself have been convicted either as the principal or as an accessory before the fact. To warrant such a conviction, the one accused must have taken part in the perpetration of, or preparation for, the crime, with intent to assist in the crime. Every act which may have a tendency to assist in the perpetration of the crime is not of absolute necessity criminal. Before it will have that effect, it must have been done with the intention on the part of the actor that it shall aid in the commission of the crime. Unless it appears without dispute that there was such intention, the person doing the act cannot be said to be a principal; and, if there is a question whether the act was done with such intent, that question must be submitted to the jury and answered by them in the affirmative before the actor can be held to be a principal, and consequently before he can be held to be an accomplice. The court was asked to charge that as a matter of law Meyers was an accomplice. That it properly refused to do. Giving to the facts sworn to the largest effect, all that can be said is that the jury, upon those facts, might have found that Meyers did the acts with intent to assist in preparations for the perpetration of that crime, and, if that intent had been found, he could be charged as an accomplice. But it was for the jury to find the intent. The court was not asked to submit to the jury the question whether he was an accomplice, or to say to the jury that, if they found that he did the acts with intent to assist in the perpetration of the crime, then he was an accomplice, and required corroboration. Had that request been made, a different question would have been presented. But the court did not err in refusing to decide the effect of those facts as a matter of law, and for that reason it was not error to refuse to charge as requested."

In People v. Bright, 203 N. Y. at page 78, 96 N. E. at page 365, Ann. Cas. 1912A, 771, Bartlett, J., writing for a unanimous court, said:

" 'To constitute an accomplice, one must be so connected with a crime that at common law he might himself have been convicted either as the principal or as an accessory before the fact.' People v. Zucker, 20 App. Div. 363, 365 [46 N. Y. Supp. 766, 767], affirmed on opinion below, 154 N. Y. 770 [49 N. E. 1102]. There is no view of the evidence which would have justified the jury of convicting the witness of the crime of which they found the defendant guilty."

In People v. Elliott, 106 N. Y. 288, 12 N. E. 602, the defendant was indicted for the crime of forgery in the second degree, charged as a second offense, in uttering a forged draft purporting to be drawn by a Montreal bank on the National Bank of the Republic of New York. The principal evidence against him at the trial was that of an accomplice, and it is claimed on his behalf that the testimony of the accomplice was not sufficiently corroborated. The General Term held that the testimony of the accomplice was not sufficient corroboration and on that ground reversed the conviction and granted a new trial. The Court of Appeals, Earl, J., writing, reversed, and in regard to evidence that the defendant and the accomplice were acquaintances, and had been seen together in Rochester and other places without explanation of his presence and various slight things of that kind, the court said:

"All these circumstances certainly have some tendency to corroborate the evidence of the accomplice, and they seem to us to satisfy the requirements of the section of the Criminal Code referred to. Each circumstance taken by

itself is quite inconclusive, but, when considered together, they certainly furnish some corroborative evidence. It is not necessary that the corroborative evidence of itself should be sufficient to show the commission of the crime, or to connect the defendant with it. It is sufficient if it tends to connect the defendant with the commission of the crime. Nor need the corroborative evidence be wholly inconsistent with the theory of the defendant's innocence."

These cases fully sustain the trial court.

[3] A letter was put in evidence, although it is not in the record, claimed to have been written by the defendant and sent to Errico at Boston through one Bechter under an assumed name. There was evidence showing an acquaintance with one Johnny Bechter, and the defendant Errico testified that that letter was in the handwriting of the defendant. The appellant makes a point on the admission of that letter, but Errico qualified fully as to knowledge of his handwriting. The rule in regard to corroboration does not attach to each and every part of the material evidence given by the accomplice. If so, there would be no necessity for using the accomplice because all the facts would have to be sufficiently proved without him. All the corroboration that is required is testimony tending to show the connection of the defendant with the crime. People v. Everhardt, 104 N. Y. 591, 11 N. E. 62. The letter was properly admitted in evidence.

All the other matters pressed upon our attention have been carefully considered, but none are serious enough to require discussion.

On both counts there was legal evidence sufficient to justify the verdict, and no errors were committed which would warrant reversal.

The judgment should be affirmed. All concur.