(160 App. Div. 385)

## PEOPLE v. DUFFY.

(Supreme Court, Appellate Division, First Department. January 23, 1914.)

1. BRIBERY (§ 10*)—EVIDENCE—STEPS PRIOR TO CONSUMMATION.

    It is competent, on a prosecution for receiving a bribe for police protection, to show the origin of the plan for the commission of the crime, and every movement towards its consummation; its history leading up to the final act furnishing the proof of the purpose and intent..

    [Ed. Note.—For other cases, see Bribery, Cent. Dig. § 9; Dec. Dig. § 10.*]

2. BRIBERY (§ 10*)—EVIDENCE—CORROBORATION.
     Testimony of a disinterested witness that defendant, charged with re-
ceiving a bribe from R. for police protection, called at R.'s place twice,
once the time in question, and asked for R., and that R. went to the
door, in view of defendant's denial that he ever called there, is highly
corroborative of R.'s testimony that he did call there and collect the
money.

     [Ed. Note.—For other cases, see Bribery, Cent. Dig. § 9; Dec. Dig.
§ 10.*]

3. BRIBERY (§ 10*)—IMPLIED AGREEMENT—EVIDENCE.
     As showing the implied agreement under which money was received
from R. by defendant, charged with receiving a bribe from R. for police
protection of his gambling house, an interview by defendant, at his solici-
tation, with F., a prior collector of graft, from which position he had
withdrawn or been withdrawn, in which defendant told him he wanted
a list of the places from which he had been collecting, the names of the
persons from whom he collected, and the amount paid by each, and the
times when they paid, and said he was going to collect from them, and
T. gave him such list, together with testimony of persons, other than R.
in such list, to systematic calls on them by defendant, with declarations
by him to them that he was successor to F. as collector for protection,
and that they made payments to him as they had to F., is competent.

     [Ed. Note.—For other cases, see Bribery, Cent. Dig. § 9; Dec. Dig. §
10.*]

4. CRIMINAL LAW (§ 510½*)—CONSCIOUSNESS OF GUILT.
     Evidence that defendant, charged with receiving a bribe from R., at-
tempted to induce R. to deny that he knew defendant, showing conscious-
ness of guilt, was corroborative of accomplices' testimony.

     [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1127–1136;
Dec. Dig. § 510½.*]

5. CRIMINAL LAW (§ 510½*)—ACCOMPLICES—CORROBORATION.
     Evidence, on a prosecution for receiving a bribe from R., held to war-
rant the inference that defendant called at R.'s place to collect money
for police protection of his gambling house, and so tend to connect him
with the commission of the crime, and thus satisfy Code Cr. Proc. § 399,
as to corroboration of an accomplice's testimony.

     [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1127–1136;
Dec. Dig. § 510½.*]

6. CRIMINAL LAW (§ 510½*)—BRIBERY (§ 10*)—EVIDENCE—IDENTITY OF DE-
FENDANT—CORROBORATION OF ACCOMPLICE.
     Testimony that defendant, charged with receiving a bribe from R. for
police protection, called on F., a prior collector of graft, from which po-
sition he had withdrawn or been withdrawn, and asked for, and by him
was furnished with, a list of the places and persons from whom he had
collected, and the amounts and times of collection, and told F. he was
going to collect from them, is competent to establish identity of defend-
ant and to corroborate R., who testified to payments to defendant.

     [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1127–1136;
Dec. Dig. § 510½;* Bribery, Cent. Dig. § 9; Dec. Dig. § 10.*]

7. CRIMINAL LAW (§ 369*)—EVIDENCE—OTHER CRIMES.
     Where evidence legitimately tends to show commission of the crime
in question, its exclusion is not required because it tends to show com-
mission of other crimes.

     [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 822–824;
Dec. Dig. § 369.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**8. CRIMINAL LAW (§ 507\*)—ACCOMPLICES.**

The agreements, under which several persons paid money to defendant for police protection, being separate, the others were not accomplices to defendant's crime of receiving a bribe from one of them.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1082–1096; Dec. Dig. § 507.\*]

**9. CRIMINAL LAW (§ 510½\*)—CORROBORATIVE TESTIMONY—OTHER CRIMES.**

Defendant having obtained from F. a list of persons, including R., from whom F. had collected money for police protection, and told F. he was going to collect from them, testimony of the others in the list that defendant made such collections from them is, on a prosecution for receiving a bribe from R., corroborative of R.'s testimony that he did so.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1127–1136; Dec. Dig. § 510½.\*]

**10. BRIBERY (§ 10\*)—EVIDENCE—INFERENCES FROM INFERENCES.**

Where defendant told F. he was going to collect bribes from persons in a list, including R., using the testimony of the others in the list, on a prosecution for receiving a bribe from R., that defendant called on and collected bribes from them, as corroborative of R.'s testimony that defendant received a bribe from him, does not involve the drawing of one inference from another, which is not permissible, but an inference from facts proved.

[Ed. Note.—For other cases, see Bribery, Cent. Dig. § 9; Dec. Dig. § 10.\*]

**11. CRIMINAL LAW (§ 507\*)—ACCOMPLICES.**

Where defendant asked F., who had previously collected bribes for police protection, but had withdrawn or been withdrawn from that position, for a list of persons from whom he had collected, and told F. he was going to collect from them; F., who merely furnished him the list, was not an accomplice in the subsequent receiving by defendant of bribes from such persons.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1082–1086; Dec. Dig. § 507.\*]

**12. CRIMINAL LAW (§ 1158\*)—APPEAL.**

Though the trial court erroneously ruled a witness was an accomplice, his testimony can on appeal be considered as that of one not an accomplice, and so not requiring corroboration.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3061–3066, 3070, 3071, 3074; Dec. Dig. § 1158.\*]

**13. CRIMINAL LAW (§ 507\*)—ACCOMPLICES.**

One who at the request of defendant, charged with receiving a bribe from R., took a message from defendant to R., asking that R. deny that he knew defendant, did not thereby become an accomplice in receiving the bribe.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1082–1096; Dec. Dig. § 507.\*]

Scott, J., dissenting.

Appeal from Trial Term, New York County.

Peter Duffy was convicted of receiving a bribe in violation of Penal Law (Consol. Laws, c. 40) § 372, and appeals. Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Henry W. Unger, of New York City (Abraham Levy, L. J. J. Schwartz, and Albert Blogg Unger, all of New York City, on the brief), for appellant.

Robert S. Johnstone, of New York City, for the People.

LAUGHLIN, J.   The indictment, in four counts with slight variations, charged defendant, who was a sergeant of police, with having received a bribe of $30 on the 3d day of September, 1912, amended on the trial to read 10th, to permit one Julius Roth to run a gambling house at 79 West 118th street, borough of Manhattan, N. Y., for one month from that date.   The jury rendered a general verdict of guilty. Counsel for appellant urge 18 points for reversal; but most of them are fully and clearly met by the evidence and by authoritative precedents, and we deem further discussion unnecessary.

[1] The only points which any member of the court deems debatable are with respect to evidence received and rulings made on questions relating to accomplices, and their corroboration, and evidence tending to show that the defendant was guilty of other crimes.   The steps resulting in the commission of crimes by the mutual consent and voluntary acts of the parties thereto are so concealed that it is impossible to predicate a conviction on what actually transpires when the crime is consummated, even if that were capable of direct proof, without or in addition to the testimony of accomplices.   It is therefore necessarily competent to show the origin of the plan or scheme for the commission of the crime, and every movement toward its consummation, for it is the history leading up to the final act that affords the convincing proof with respect to the purpose for which the bribe was exacted and the criminal intent which is an essential element of the crime.

The theory of the people is: That in the month of March, 1908, one Fox, a patrolman assigned to duty in plain clothes in the Sixth inspection district and Forty-Third precinct under Captain Walsh, demanded of said Roth, who was then conducting a gambling house at the place specified in the indictment, which was in said inspection district and precinct, under the name of the Academic Club, $30 per month for protection from interference by the police, and that from that time on until the 1st day of July, 1912, Fox collected that amount from Roth regularly between the 8th and 12th days of each month according to Roth's testimony, and the 7th and 11th according to Fox's testimony.   That on June 22, 1910, Fox was assigned to patrol duty in the Fortieth precinct, and, although Roth's place remained in the Forty-Third precinct, Fox continued to collect of Roth as before, and Roth received such protection.   That on said 1st day of July, 1912, a new precinct, known as No. 37, was created, embracing part of old precinct No. 43, including Roth's place, but Fox remained attached to the Fortieth precinct.   That the defendant was then a sergeant of police and assigned to duty in the Thirty-Sixth precinct.   That said three precincts remained in the Sixth inspection district, and that Fox and the defendant were both, through their respective captains, under the direction of the inspector of that inspection district.   That when Fox collected from Roth in June, 1912, it was remarked between them

that that would be his last collection, as the district was to be divided. That on July 2, 1912, at 11:30 p. m., the defendant, by telephone, requested Fox to meet him next morning at 8:30 at 125th street and Madison avenue, which was near the precinct station to which defendant was assigned and the headquarters of the Sixth inspection district, which was in the same building. That they met pursuant to the appointment, and the defendant said to Fox, "I want a list of the places from which you have been collecting from that were formerly in the Forty-Third precinct that go into the new Thirty-Seventh precinct; I want the names of the persons from whom you received the money; I want the time that you receive it and the amount;" also saying, "I am going to collect from them." That Fox gave the information requested, specifying six places, and the defendant wrote it down in a memorandum book. That the information thus given and so written down was as follows:

"79 West 118th street, Julius Roth, $30, about the 9th or the 11th of the month; 62 West 125th street, the man's name from whom I collected was unknown to me, $50 a month, the 1st of the month; 20 West 125th street, $50 a month, Mr. Quackenbush, about the 15th of the month; 308 Lenox avenue, Mr. Lennon, $50, about the 7th of the month; 48 and 50 West 135th street, Bully Hawes, $150 a month, the 15th of the month; 135th street and Fifth avenue, Le Roy, $50 a month, the 1st of the month."

That thereafter defendant called on Roth, saying "I am Duffy; I have come to take the place of Fox," or "I have come to succeed Fox," whereupon Roth then put $30 in an envelope and handed it to defendant. According to the testimony of Fox, his last collection of Roth was made in June, 1912; but Roth's testimony tends to show that Fox also collected in July and August, and that defendant's first collection was on September 10, 1912, the date charged in the indictment as amended, and that the defendant called regularly monthly thereafter and received the same amount in like manner until December. It is not very material whether the collection which the defendant made from Roth on the evening of September 10, 1912, was the first, second, or third collection so made by him. The important point is that he collected money of Roth that night under circumstances plainly indicating an agreement and understanding that Roth's gambling house was not to be interfered with by the police, as concededly it was not, for a month thereafter.

The principal evidence in behalf of the people was given by Fox and Roth, both of whom the people conceded and the trial court ruled were accomplices. Fox further testified that on the 18th or 19th of July, 1912, he accidentally met the defendant at 125th street and Eighth avenue and asked if defendant had collected from all on the list he had given to him on July 3d, and defendant admitted that he had, with the exception of Quackenbush, from whom he said he had received only $25; and that on that occasion Lennon, the proprietor of one of the six places he had enumerated to defendant, was with the latter, but walked away before Fox joined him. Lennon corroborated Fox as to this meeting, but did not hear the conversation. The defendant admitted that he knew Roth, and knew that he was conducting a gambling house, but he denied that he ever called there or col-

lected or received any money from him, and denied that he met Fox on either occasion, to which Fox testified, or that he ever had such interviews with him.

[2] At the time the crime is charged in the indictment, the defendant had no duty to perform in the precinct in which Roth's place was located, and was assigned to patrol duty in another precinct. Concededly he was off duty at the time when it is charged he called at Roth's place and made the collection. That he did call at Roth's place in citizen's clothes in the evening between the 1st and 10th of August, and again about a month later and between the 1st and 10th of September, and on each occasion asked for Roth, and waited at the basement gate for him to be summoned, was shown by the testimony of a disinterested witness named Harris, who was in Roth's employ as a waiter, and who answered the basement door bell, and knew and identified defendant, and at his request notified Roth that defendant wanted to see him, and in response thereto saw Roth start in the direction of the basement street door. This, in view of defendant's denial that he called there at all, is most convincing evidence corroborative of Roth's testimony that defendant called there and collected the $30 as stated. Fox, on or shortly before ·February 6, 1912, had been charged with, and had pleaded guilty to, bribery, and on the day last mentioned the defendant was transferred to a precinct in Brooklyn. According to the testimony of one Shea, who was a personal friend of the defendant, the latter that night asked him to deliver a message to Roth, to the effect that if anybody should ask Roth whether he knew defendant "to stand pat and say that he didn't know him," and Shea personally delivered the message to Roth the next evening. The defendant also denied the conversation to which Shea testified. Lennon and Quackenbush, whose names were given by Fox to defendant as the proprietors of gambling houses from whom collections were being made, and Quackenbush, whose name was unknown to Fox, but who was the proprietor of the place at 62 West 125th street given to defendant by Fox, were permitted to testify, over objections and exceptions duly interposed and taken that it tended to show the commission of other crime, that after July 1, 1912, defendant called on them, representing that Fox was not coming around any more and that he was coming around in place of Fox. Lennon said that he paid the defendant the same amount in like manner, and at the same period of each month. Wilkins said he paid $10 per month more, because it was demanded by defendant, who, after having asked and been informed that the amount paid to Fox was $50, said, "It will cost you $60." Quackenbush said he put defendant off at first on the plea that "business was bad," but that defendant called later and received $15 or $25 the first time, and $25 one or two times later. All of them were likewise permitted to testify that there was no police interference.

[3-7] The learned counsel for the appellant contend that the corroboration of Fox and Roth was not sufficient. The prosecution could not be sustained by merely showing the payment of the money to the defendant. It was necessary to show some agreement or understanding by which the defendant was to refrain from performing his duty as a police officer. It is extremely doubtful whether that could be in-

ferred from what took place between defendant and Roth at the latter's gambling place on the night of September 10, 1912, even if Roth were corroborated as to that meeting. If that was the first time defendant called to collect, the evidence that he said he had taken Fox's place pointed toward bribery; but, if that was the second or third time he called, the meeting was marked by complete silence, and nothing took place but the passing of the envelope containing the money. The preceding interview with Fox, however, and proof of the arrangement between Fox and Roth, which the defendant adopted, followed by the systematic calls upon three of the others from whom Fox had been collecting, with declarations by him to the effect that he was successor to Fox as collector of protection from gambling houses, clearly and convincingly show the implied agreement under which the defendant received the money from Roth. I am of opinion that this evidence was competent, not only as characterizing the purpose for which the money was received from Roth, but that it, together with the evidence showing consciousness of guilt by attempting to induce Roth to deny that he knew defendant, which tends to corroborate the accomplices (People v. McLean, 84 Cal. 480, 24 Pac. 32; State v. Brin, 30 Minn. 522, 16 N. W. 406), and with the evidence of the waiter Harris, with respect to the two calls made by defendant at Roth's place, would warrant the inference that he called there to collect money as a condition of affording protection to the gambling house. If so, then such corroborating evidence tends to connect the defendant with the commission of the crime and clearly satisfies the requirement of section 399 of the Code of Criminal Procedure. People v. Patrick, 182 N. Y. 131–157, 74 N. E. 843; People v. O'Farrell, 175 N. Y. 323, 67 N. E. 588; People v. Ogle, 104 N. Y. 511, 11 N. E. 53; People v. Blatt, 136 App. Div. 717, 121 N. Y. Supp. 507; People v. Elliott, 106 N. Y. 288, 12 N. E. 602; People v. Elliott, 155 App. Div. 486, 140 N. Y. Supp. 553; People v. Terwilliger, 74 Hun, 310, 26 N. Y. Supp. 674, affirmed 142 N. Y. 629, 37 N. E. 565. The case presented is, in legal effect, precisely the same as if Fox, in response to defendant's request, had made a list of the six places in writing, giving the amounts they were paying and the times to call for the money, and had handed it to the defendant, and the latter had said that he would call at those places at the times stated to make the collections. There can be no doubt that the entire interview between the defendant and Fox was competent. It indicated an intention on the part of the defendant to commit the crime in question and many others, embraced in a preconceived scheme and plan to levy tribute on gambling houses as the price of noninterference by the police. It was therefore competent to show every step taken by defendant in the consummation thereof prior to the commission of the crime in question; and such evidence was admissible, not only, as already stated, to show the purpose for which he called on and received the money from Roth, but to establish the identity of defendant and to corroborate Roth. People v. Weinseimer, 117 App. Div. 603, 102 N. Y. Supp. 579; People v. Zucker, 20 App. Div. 363, 46 N. Y. Supp. 766; s. c., 154 N. Y. 770, 49 N. E. 1102; People v.

Marrin, 205 N. Y. 275, 288, 98 N. E. 474, 43 L. R. A. (N. S.) 754; State v. Schnettler, 181 Mo. 173, 79 S. W. 1123; People v. Molineux, 168 N. Y. 264, 272, 273, 61 N. E. 286, 62 L. R. A. 193; Wigmore on Evidence, §§ 100, 103, 104, 343, 306, 317, and 414. The fact that it shows the commission of other crimes did not require its exclusion, if, as I think, it legitimately tended to show the commission of the crime in question. People v. Place, 157 N. Y. 584, 52 N. E. 576; People v. Molineaux, 168 N. Y. 264, 293, 307, 61 N. E. 286, 62 L. R. A. 193; People v. Shea, 147 N. Y. 99, 41 N. E. 505; People v. Sharp, 107 N. Y. 427, 14 N. E. 319, 1 Am. St. Rep. 851; People v. Weinseimer, supra; People v. Katz (Ct. of Appeals) 103 N. E. 305; Wigmore on Evidence, § 215.

[8-10] Lennon, Quackenbush, and Wilkins were not accomplices to the bribery charge in question. There is no evidence of a joint agreement between them and Roth and the defendant. They had no part in the commission of this crime. Manifestly if they had been passing along the street in front of Roth's place, or had been in Roth's place, they would have been competent witnesses to show that the defendant called there and had an interview with Roth, and to the conversation if they overheard it, notwithstanding the fact that they were paying for like protection. Likewise it would have been entirely competent for them to testify to any admission made by the defendant with respect to his intention to collect from Roth, or his having done so, even though in the same connection he demanded money of them. The evidence was not received to show the commission of other crimes by the defendant, but to show the intent with which he called upon and received the money from Roth and to identify him as the man who probably called on Roth, which was controverted, in carrying out the scheme or plan which he announced and undertook when he succeeded Fox as collector of tribute for police protection in that territory. If he had told Fox that he would call on the proprietors of the six gambling houses at a time definitely specified, dressed in a particular manner, or making a particular announcement as signalizing the purpose of his visit, and it were shown by the other five that he called on them in pursuance of this plan and in conformity therewith, and Roth testified to the same thing with respect to the call on him, I am of opinion that the testimony of the other five would be strongly corroborative of the testimony of Roth, for it would be highly probable that, if he carried out his preconceived plan with respect to five of the gambling houses, he would do so with respect to the other. This evidence did not involve the drawing of one inference from another, which was condemned in People v. Razezicz, 206 N. Y. 249, 99 N. E. 557. It involved legitimate inference from facts proved.

[11-13] Moreover, I am of opinion that Fox was not an accomplice with the defendant in the commission of the crime charged in the indictment (People v. Zucker, supra; People v. Bright, 203 N. Y. 73, 96 N. E. 362, Ann. Cas. 1913A, 771; People v. Yannicola, 133 App. Div. 885, 117 N. Y. Supp. 381); and, if not, his testimony needed no corroboration. In the particular circumstances of this case, I think that the fact that the court ruled otherwise is not important, for the verdict plainly shows that the jury believed the testimony of Fox.

Therefore, if they believed that testimony, notwithstanding the fact that they were erroneously instructed that it must be corroborated, the defendant could not be prejudiced by such erroneous instruction, and the verdict may, if need be, be sustained on the theory that the instruction was erroneous. If, instead of obtaining the information from Fox, the defendant or others who were to be the beneficiaries of the moneys thus collected had conceived the plan of having Fox give the information to another who had had nothing to do with the collections, and the defendant had called on such third party for and obtained the information from him, then it is perfectly clear that such third party would not be an accomplice, and his testimony would require no corroboration on that theory. Fox, according to the evidence, did not induce the defendant to commit the crime, and he was not to receive any of the spoils. Nor did he induce the other gamblers to make payments to the defendant. He merely surrendered his position as collector and apparently had nothing more to do with the matters. He merely informed the defendant concerning the crimes which he had committed, in communicating the information which the defendant desired as to where gambling houses were which had been paying tribute. The fact that Fox, in collecting from these houses theretofore, had committed the crime of bribery did not make him a party to the commission of similar crimes in the future by the defendant. There was nothing criminal in anything Fox did or said at the interview between him and the defendant. I fail, therefore, to see any theory upon which Fox was an accomplice with the defendant in the commission of this crime. In my opinion, the guilt of the defendant is amply sustained by the evidence, even on the theory that Fox was an accomplice; but, on the assumption that Fox was not an accomplice, the evidence of his guilt is overwhelming. The further contention that Shea, by conveying the message from the defendant to Roth became an accomplice, is without merit. See People v. Zucker, supra, and People v. McGuire, 135 N. Y. 639, 32 N. E. 146.[1]

It follows, therefore, that the judgment of conviction should be affirmed.

INGRAHAM, P. J., and McLAUGHLIN and CLARKE, JJ., concur.

SCOTT, J. I feel constrained to dissent from the affirmance of the judgment appealed from for what I deem to be the error involved in the admission of evidence of independent and unrelated crimes, to wit, the taking of money from persons other than Roth, who alone was named in the indictment as the person who bribed defendant.

[1] Reported in full in the Northeastern Reporter; reported as a memorandum decision without opinion in the New York Reports.