THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM CONA et al., Appellants.

Second Department, January 9, 1978

APPEARANCES OF COUNSEL

*Stanley M. Meyer* for William Cona and another, appellants.

*Stanley Schimmel* for Richard White and others, appellants.

*Joseph Fallek* and *Evseroff & Sonenshine (William Sonenshine, Lewis R. Friedman* and *Herman Kaufman* of counsel), for the remaining appellants (one brief).

*Eugene Gold, District Attorney (Richard C. Laskey* of counsel), for respondent.

## OPINION OF THE COURT

TITONE, J.

In May, 1972 the 16 defendants-appellants, and 8 others, all of whom had been members of the New York City Police Department, were indicted, *inter alia,* on one count of bribe receiving, one count of receiving a reward for official misconduct, two counts of conspiring to commit the previously mentioned crimes and one count of official misconduct. All of the appellants were convicted of the above-described counts. One of the appellants, Eugene McDaniel, has since died. Accord-

ingly, his appeal should be dismissed and the case remanded in order that the judgment against him be vacated (see *People v Tong,* 28 AD2d 999).

The crux of the People's case was that each of the accuseds had participated in what came to be known as a "pad" at the 13th Plainclothes Division. Periodic payments were allegedly made by various gamblers for the right to carry on their illegal activities freely and without fear of arrest within the geographical limits of the 13th Division. The pad operated as a type of club, with meetings being held at various times and with certain rules and regulations being agreed upon. Certain officers were assigned to collect the periodic payments, known as "contracts", from the different gamblers. The pad members elected one or two "splitmen", who were responsible for distributing the proceeds. At the periodic pad meetings .there were discussions of such matters as how to induce other gamblers to join the pad, whether to raise the amounts paid by gamblers into the pad and whether to invite newly as-signed division officers into the conspiracy. For security pur-poses, officers who were transferred to the plainclothes unit of the 13th Division who wanted to join the pad were required to wait a few months to be cleared for membership. Officers leaving the division would usually receive severance pay in the form of two months' payments.

The focus of this appeal centers on the testimony of three police officers, Phillips, O'Brien and Buchalski. Each had previously been a member of the pad, but later agreed to co-operate with the authorities and became police informants. Buchalski also agreed to act in an undercover capacity by securing tape recordings of conversations with his fellow members of the pad. At the trial tape recordings obtained by Buchalski of conversations he ostensibly had held with 10 of the appellants herein were admitted in evidence.

On appeal, the 15 surviving appellants contend, *inter alia,* that insufficient envidence was adduced at the trial to warrant their convictions since there was no corroboration of the testimony of the three members of the pad who co-operated with the prosecution. According to appellants, Buchalski, Phil-lips ·and O'Brien were accomplices at all stages of their association with the pad and its members, both before and after they agreed to become undercover agents.

In rebuttal, the People point to the recorded conversations by Buchalski with certain of the appellants and to testimony

of nonaccomplice witnesses as constituting sufficient corroboration of any accomplice testimony.

THE LAW

The rules of evidence with respect to corroboration of accomplice testimony are set forth in CPL 60.22 as follows:

"1. A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense.

"2. An 'accomplice' means a witness in a criminal action who, according to evidence adduced in such action, may reasonably be considered to have participated in:

"(a) The offense charged; or

"(b) An offense based upon the same or some of the same facts or conduct which constitute the offense charged.

"3. A witness who is an accomplice as defined in subdivision two is no less such because a prosecution or conviction of himself would be barred or precluded by some defense or exemption, such as infancy, immunity or previous prosecution, amounting to collateral impediment to such a prosecution or conviction, not affecting the conclusion that such witness engaged in the conduct constituting the offense with the mental state required for the commission thereof."

CORROBORATION

### I. EVIDENCE OBTAINED FROM RECORDED CONVERSATIONS

(a) <u>Appellants Reitano, Maroney, Brown, Carter, Conti, Cona and Auletta</u>: One or more of the three police officers who had been members of the pad but who later co-operated with the investigation and became witnesses for the prosecution at the trial (Buchalski, Phillips and O'Brien), testified that each of these seven appellants had knowingly participated in the operation of the pad. In addition, the People submitted tape recordings of conversations Buchalski had with the afore-mentioned appellants.

These appellants contend, *inter alia,* that the conversations recorded by Buchalski did not constitute corroboration of the accomplice testimony since the voices on the tapes were identified by Buchalski, himself an accomplice. The People's response is that at the time of the recorded conversations, Buchalski was not an accomplice, since they occurred after

January 10, 1972, the day he was confronted with proof of his criminal involvement in the pad operations. On that day Buchalski agreed to co-operate in the investigation and, *inter alia,* "elicit admissions of past corrupt activities by anyone in the [13th] division". Once Buchalski agreed to co-operate, the People rationalize, he was no longer a conspirator, and thus no longer an accomplice. His becoming an agent, concludes the People, constituted a resumption of Buchalski's true police role. In my opinion the People's reasoning is specious and its conclusions are obtuse.

■ The law is settled that a decoy or undercover detective, having no motive to fabricate a story, should not be considered an accomplice under a statute requiring corroboration of an accomplice's testimony to support a conviction *(People v Swift,* 161 Misc 851, affd 251 App Div 808, affd 277 NY 618; see, also, 22A CJS, Criminal Law, § 778). However, in the instant situation, it cannot be said that Buchalski had no motive to fabricate after he became an informant. His consent to co-operate obviously did not spring from any lofty desire on his part to uphold his sworn duty to maintain law and order and ferret out crime. Rather, such consent had as its genesis a determination to avoid prosecution for his past criminal behavior while "on the pad". Under such circumstances, the credibility of Buchalski, both as to recorded and unrecorded incriminatory statements ostensibly made by these appellants after he was pressured into becoming an informant, is no less suspect than his version as to what transpired before that date. As the District Attorney candidly admits in respondent's brief: "Buchalski accepted [then] Assistant District Attorney Hynes' *offer of immunity in exchange for his* cooperation in the 13th Division investigation" (emphasis supplied).

■ The purpose of conferring immunity is to aid prosecuting officers in apprehending criminals, or those engaged in criminal enterprises, by inducing them or their confederates to turn State's evidence and testify for the prosecution (22 CJS, Criminal Law, § 46, subd [2]). Thus, the status of an admitted accomplice is not altered by immunity conferred in return for his co-operating with the prosecution and testifying on the People's behalf (CPL 60.22, subd 3; cf. *People v Jackson,* 69 Misc 2d 793).

■■ Prior to the enactment of CPL 60.22, the test as to whether an individual was an accomplice was whether he could have been convicted either as a principal or as an

accessory before the fact *(People v Beaudet,* 32 NY2d 371). Thus, under such prior rule, witnesses who were not subject to indictment, but whose involvement with the accused in the crime, although real, was tangential, were not denominated accomplices. Now, under CPL 60.22 (subd 2), a statutory attempt has been made to give practical meaning to the term "accomplice", and to avoid an unduly restrictive application to its definition. The definition now includes not only those who "may reasonably be considered to have participated in * * * [t]he offense charged" (CPL 60.22, subd 2, par [a]), but also, as stated in paragraph (b) of subdivision 2, those witnesses who "may reasonably be considered to have participated in * * * [a]n offense [i.e., reciprocal or correlative] based upon the same or some of the same facts or conduct which constitute the offense charge" (see *People v Jackson,* 69 Misc 2d 793, *supra* [bracketed matter supplied]). As the court further noted in *People v Jackson (supra),* Professor (now Judge) Denzer, in his Practice Commentary to CPL 60.22, opines that the intent of paragraph (b) of subdivision 2 is to include persons "who are *in some way* criminally implicated in, and possibly subject to, prosecution for the general conduct or factual transaction on trial" (Denzer, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 60.22, pp 194-195 [emphasis in original]). Its intended effect, concludes Professor Denzer (p 195), is to "broaden the definition of an accomplice as the term is applied to witnesses, in order to provide a more equitable, operable and consistent standard for the courts in determining when the requirement of corroboration is applicable." Simply put, whether the testimony of a witness should be considered as that of an acccomplice depends upon whether his participation in the offense, or conspiracy from which the offense directly emanated, was criminally corrupt.

█ Applying such rationale to Buchalski, it is evident that he knowingly, willingly and actively participated in a widespread, conspiratorial and corrupt endeavor, purportedly with these seven appellants and others, before he agreed to cooperate with the subject investigation. Thus, there was clearly an evidentiary showing that Buchalski, within the purview of paragraph (b) of subdivision 2 of CPL 60.22, "based upon * * * some of the same facts or conduct which constitute the offense charged", was *"in some way* criminally implicated in", and "possibly subject to, prosecution for the general conduct or factual transaction on trial." The fact that Buchalski was no

longer a coconspirator at the time he tape-recorded incriminatory conversations does not negate the requirement of independent corroboration with respect to his testimony about such conversations. Indeed CPL 60.22 would have little meaning if testimony by an accomplice as to alleged admissions made to him by an accused after the accomplice became an informant in order to avoid prosecution were to be considered "independent" corroborative evidence of events involving the accused and the accomplice before the latter attained the status of an informant.

■ ■ Accordingly, I believe that in the absence of nonaccomplice identification of the voices on the tapes, the introduction of such exhibits based on Buchalski's identification did not constitute independent proof "tending to connect" the seven above-named appellants with the crimes charged (see *People v O'Farrell,* 175 NY 323). Objective evidence authenticated solely by an accomplice cannot serve as independent corroborative evidence of his testimony connecting an accused with the commission of an offense in which both are involved (96 ALR2d 1185, 1188-1193; see, also, *People v Siegel,* 282 App Div 747; *People v Harrell,* 282 App Div 1051; *People v White,* 62 Hun 114).

■ Furthermore, and contrary to the People's contention, the seven appellants herein are not precluded from asserting on appeal that Buchalski was an accomplice as a matter of law with respect to his testimony as to recorded and incriminatory statements allegedly made by them after he was pressured into becoming an informant, despite the fact that no exception was taken to the trial court's failure to charge in that regard (cf. *People v Bell,* 32 AD2d 781, 782). In my opinion, since Buchalski's testimony was that of an accomplice as to conversations with these appellants after he agreed to co-operate with the investigation, there was insufficient trial evidence adduced to support their convictions. Accordingly, their judgments of conviction must be reversed on the law and the accusatory instruments dismissed as to them (see CPL 470.20, subd 2).

■ (b) Appellants Melnick and White: Apart from the testimony of Buchalski, both appellants Melnick and White identified their voices on the recordings made by Buchalski. Each disputed the incriminatory interpretation given by the prosecution as to his recorded conversations with Buchalski. In my opinion such voice identification by each of these

appellants was sufficient to corroborate the accomplice testimony of Buchalski as to the recorded conversations. A defendant who does not rest after the trial court has failed to grant a motion to dismiss, proceeds on the risk that he will inadvertently supply a deficiency in the People's case *(People v Kirkpatrick,* 32 NY2d 17, 21; *People v Farina,* 290 NY 272, 274). Therefore, the convictions of appellants Melnick and White should be affirmed.

(c) Appellant Bergold: In addition to Buchalski's testimony with respect to his recorded conversations with appellant Bergold, and the testimony of Phillips and O'Brien as to Bergold's criminal involvement in pad operations, testimony was also adduced from a nonaccomplice police lieutenant (Damiana) of observations made by him of this appellant. According to Damiana, on March 20, 1972 he saw Bergold leave his car and enter an automobile driven by one Ralph De Feo, a known gambler. Damiana also testified that a month later, he again saw Bergold leave his car and enter a Ford driven by De Feo.

Earlier in the trial Buchalski identified Bergold's voice in a recorded conversation Buchalski had had with him. In that conversation Bergold is heard notifying Buchalski of a meeting of pickup men and referring to himself as being one of them. In addition, O'Brien testified how Bergold once gave him $350 with an explanation that the reason the amount was small was because a number of gamblers, whose names he mentioned, were "out" when efforts were evidently made to collect pad money from them.

In my opinion the observations made by Damiana were sufficient independent corroborative evidence to buttress the testimony of the accomplices as to Bergold's criminal involvement in pad operations. I believe Damiana's testimony connected Bergold with the criminal enterprise in such a way that the jury could reasonably be satisfied that the accomplices were telling the truth (cf. *People v Harris,* 52 AD2d 672; *People v Shaw,* 49 AD2d 658, 659). Accordingly, the judgment of conviction of appellant Bergold should be affirmed.

II. EVIDENCE OBTAINED FROM SOURCES OTHER THAN RECORDED CONVERSATIONS

(a) Appellants Zummo and Mattina: The only purported corroboration of the testimony given by Buchalski and Phillips as to these two appellants being members of the pad was the

tesimony of O'Brien. Like Buchalski and Phillips, O'Brien had been a member of the pad, but later agreed to co-operate with the investigation. Evidence adduced at the trial reveals that in June, 1970 O'Brien had been selected to work as an undercover agent in the 13th Division. Sometime in October, 1970 O'Brien joined the pad, not as an undercover agent, but for his own gainful, albeit illegal, motives. At the end of the trial, the court refused a defense request to charge that O'Brien was an accomplice as a matter of law. Instead it charged that while O'Brien was an accomplice as a matter of law "at the very latest, sometime in mid or late October of 1970", it was up to the jury to decide whether he was an accomplice before that time. I disagree with the trial court's action in this instance.

In my opinion, the need for corroboration is not eliminated merely because a witness was a coconspirator during one period of the conspiracy and a nonconspirator during another period. It is conceded that O'Brien, from October, 1970 until the following June, when he was transferred out of the 13th Division, shared in the proceeds from the pad, including severance pay when he left the division. He also received a contract, which he performed, to collect money from gamblers contributing to the pad. O'Brien's complicity in these acts rendered him criminally liable and therefore established his status as an accomplice. The rationale for requiring corroboration of O'Brien's testimony, therefore, notwithstanding that he might not have been a member of the conspiracy prior to the commission of certain crimes to which he testified, is that, since he reaped benefits from his belated participation in the corrupt endeavor, he, like Buchalski, had a motive to share his guilt with others such as appellants. The risk of his testifying falsely against others in a criminal case in order to avoid prosecution is in no way diluted by any earlier absence of conspiratorial intent. One who joins an existing conspiracy takes it as it is, and is therefore accountable for the prior conduct of his coconspirators *(United States v Sansone,* 231 F2d 887, cert den 351 US 987). Since the testimony of O'Brien should have been considered as that of an accomplice, both as to events occurring before and during his involvement with the conspiracy, his testimony buttressing that of his fellow accomplices, Phillips and Buchalski, did not constitute an independent basis in support of the convictions of appellants Zummo and Mattina (see *People v O'Farrell,* 175 NY 323,

*supra).* Accordingly, their judgments of conviction must be reversed, and the indictments dismissed as to them.

(b) Appellant Fortuna: Phillips, one of the conspirators who later agreed to co-operate with the investigation, testified that on July 21, 1971 he used the apartment of his brother-in-law, Al Saievo, located on Menahan Street in Brooklyn, to hold a meeting of the pad. Both Phillips and Buchalski testified that Fortuna was present at the meeting. Saievo testified that Phillips had asked him if he (Phillips) could use Saievo's apartment for an evening, in order to have a meeting or get together with the people he worked with. When Saievo asked Phillips whether he should be home at the time of the meeting, Phillips responded that he "rather" Saievo not be there. Saievo also identified Fortuna as one of the persons who attended the meeting, and a person with whom he and Phillips had gone fishing on one occasion.

Fortuna, in his testimony, denied, *inter alia,* that he was ever present at a meeting on Menahan Street or was ever a member of the pad. He also swore that he was unaware of the existence of the pad in the 13th Division. He did admit that he had gone fishing with Saievo sometime in May, 1971.

In my opinion the corroborative testimony of Saievo, a nonaccomplice, was sufficient independent evidence to support the accomplice testimony that Fortuna was present at the subject meeting in Saievo's apartment. The testimony of Saievo is most convincing evidence corroborative of Phillips' and Buchalski's testimony, in view of Fortuna's denial that he was at the meeting, and his admission that he knew Saievo (cf. *People v Duffy,* 160 App Div 385, 389). Accordingly, the conviction of appellant Fortuna should be affirmed.

(c) Appellant Callis: According to Phillips and Buchalski, appellant Callis was also at the July 21, 1971 meeting of the pad in Saievo's apartment. However, Saievo did not identify this appellant as being present that evening. Therefore, since no independent evidence was adduced placing Callis at such meeting, his conviction must be reversed and the indictment as against him dismissed.

(d) Appellant Greene: Both Phillips and Buchalski testified that appellant Greene, a policewoman, was present at the July 21, 1971 meeting in Saievo's apartment and that she, *inter alia,* acted as secretary of the pad, kept a written tally of the July pad money collected and to be collected, and was given a "contract" (to collect) from a gambler named Willie

De Sapio. Saievo remembered that one of the persons who entered his apartment that evening was a very tall colored woman, who, he believed, had a wig and sunglasses on. When requested by the prosecutor to look around the courtroom to see if that woman was present, Saievo said that he did not see her.

In testifying in her own behalf, appellant Greene admitted that she was the only policewoman assigned to the 13th Division. However, there were several policewomen, most of them Black, who worked in other commands in the area. Furthermore, at the times she was off duty or not available, other policewomen, most of them Black, replaced her in the 13th Division. She denied having been at the meeting in Saievo's apartment on June 21, 1971, but admitted she did not work on that evening.

In my opinion, Saievo's failure to identify appellant Greene in the courtroom renders meaningless his description of a very tall colored woman being present at the subject meeting in his apartment. Since Saievo was unable to identify her, it follows that the evident determination by the jury that she was the very tall colored woman in question was speculative (cf. *People v Orlandino,* 250 App Div 856). Accordingly, the judgment of conviction of appellant Greene must be reversed and the indictment as against her dismissed.

I have considered appellants' other arguments and find them to be without merit. In summary, the judgments of conviction of appellants Melnick, White, Bergold and Fortuna should be affirmed. The judgments of conviction of appellants Reitano, Maroney, Brown, Conti, Carter, Cona, Auletta, Zummo, Mattina, Callis and Greene should be reversed and the indictment as to each dismissed.

RABIN, J. (concurring in part and dissenting in part). I concur with the majority in dismissing the appeal of appellant McDaniel, who is now deceased, in affirming the judgments of appellants Melnick, White, Bergold and Fortuna, and in reversing the judgments of appellants Callis and Greene; but I otherwise dissent and vote to affirm the remaining judgments.

In June, 1970 Police Officer James O'Brien was selected by Deputy Inspector William T. Bonacum, the Executive Officer of the Internal Affairs Division, to work as an undercover agent in the 13th Division, which Bonacum believed was "corruption-prone". For approximately the first three months

of his undercover assignment, O'Brien reported to Bonacum on a fairly regular basis. They met on approximately 8 to 10 occasions and O'Brien filed approximately 8 written reports with Bonacum during the months of June and July, 1970. Additionally, O'Brien telephoned Bonacum on several occasions. O'Brien's last attempt to call Bonacum occurred on the evening of September 22, 1970 and was prompted by an incident which had occurred earlier that evening when O'Brien had been on assignment with appellants Mattina and Zummo. On that evening these two appellants received $990 from Percy Peart, a known gambler. Mattina gave $330 to O'Brien. Shortly after he received the money O'Brien attempted to contact Bonacum by telephone to report the incident. However, he was unsuccessful in his attempt.

On the next day O'Brien, together with Phillips, attended his first "pad" meeting at the Hill Top Social Club in Brooklyn. O'Brien testified that appellants Mattina, Zummo, McDaniel and other members of the 13th Division "pad" were also present.

O'Brien testified that when he accepted the $330 from Mattina on September 22, 1970, and when he attended the "pad" meeting on the next day, he was still acting as an undercover agent on behalf of the police department because he had not then determined that he would not report the two events to Bonacum. He made the decision to become a member of the "pad" in October, 1970.

Also testifying on behalf of the People was Police Officer Stephen Buchalski, who had been a member of the "pad" until January 10, 1972. On that day he was brought to the District Attorney's office and agreed to co-operate with the investigation in exchange for the District Attorney's offer of immunity.

Subsequent to January 10, 1972 Buchalski, while working as an agent of the District Attorney's office, engaged in conversations with members of the "pad", which conversations were tape-recorded. At the trial, tape recordings with 10 of the appellants herein were admitted in evidence.

Each of the appellants predicates his argument that the evidence was legally insufficient upon an alleged lack of the independent proof to corroborate accomplice testimony required by CPL 60.22 (subd 1). It is argued that the testimony of O'Brien had to be corroborated because he was at one time a member of the "pad" and that the tape recordings could not

be considered corroborative evidence because the voice identifications were made by an accomplice—Buchalski. I disagree.

During the specific periods when both O'Brien and Buchalski were acting not as coconspirators but, rather, as undercover policemen in an attempt by the police department to ferret out internal corruption, they were not accomplices of the appellants as defined by CPL 60.22 (subd 2). Thus, their testimony as to events and observations they made at the time they were acting as undercover police officers did not require corroboration.

An "accomplice", as defined by CPL 60.22 (subd 2) is "a witness in a criminal action who, according to evidence adduced in such action, may reasonably be considered to have participated in: (a) The offense charged; or (b) An offense based upon the same or some of the same facts or conduct which constitute the offense charged." The majority is holding that this definition encompasses an undercover police investigation by a former accomplice. Such a holding is in error, disregards the prior case law leading to the present legislative enactment, and misconstrues its application.

At common law, an accomplice was one who could have been convicted of the actual crime charged against the accused as a principal only, excluding those guilty of aiding and abetting or counseling and procuring. New York, by statute, expanded this definition to cover one who could have been convicted of the actual crime charged against the accused as a principal, aider and abettor, i.e., the accessory before the fact (see Code Crim Pro, § 399, as amd by L 1882, ch 360, § 1; *People v Sweeney,* 213 NY 37). However, the offense of the principal and the accomplice had to be identical. Thus, in instances where each of several parties to a transaction might be guilty of a crime, if the crimes were separate and distinct, then one was not the accomplice of the other *(People v Blank,* 283 NY 526; *People v Gibson,* 301 NY 244). With the enactment of the Criminal Procedure Law, the Legislature broadened the statute (see Denzer, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 60.22, pp 194-195).

Under the new statute, "accomplice" includes not only the principal or an accessory before the fact, but also those who participated in the offense charged in a reciprocal, correlative or tangential manner (see *People v Beaudet,* 32 NY2d 371). However, for the accomplice statute to apply, one must also be found criminally liable for the specific conduct one actually

participated in during the commission of the offense on trial *(People v Basch,* 36 NY2d 154). The question of intent must always enter as an element of the crime as well *(People v Wheatman,* 31 NY2d 12).

Clearly, one who participates in an offense solely for the purpose of obtaining evidence upon which to convict other participants is not criminally liable for that activity and is not an accomplice within the rule requiring corroboration of testimony of an accomplice *(People v Noelke,* 94 NY 136). These officers, while they were reporting the appellants' activities to their superiors, or taping appellants' conversations, certainly could not be prosecuted as accomplices, so why should not their testimony be heard and weighed by the jury as that of nonaccomplice witnesses? We should not now hold, nor has any case or statute been cited which holds, that a witness once a conspirator is forever condemned to testimonial impotence. Nor need we hold that a believable government witness who later goes astray should have his nonconspiratorial testimony automatically discarded.

It follows that in June, 1970, when O'Brien was assigned to the 13th Division to investigate possible police corruption, he was not acting as an accomplice. Rather, he was performing his assigned task of working as an undercover agent to obtain evidence of corruption by other members of the police department. As mentioned above, for the first three months of his assigned duty O'Brien reported to Bonacum on a regular basis, filed written reports with him, telephoned him on several occasions and advised him that he had received $10 or $20 from Patrolman Phillips in July, 1970. O'Brien also testified that he had tried unsuccessfully to reach Bonacum by telephone the night he received $330 as his one-third share of the money received from Peart—Mattina and Zummo having received the other two thirds. Bonacum testified that he had received a message that O'Brien had in fact called him that evening. Not until some time in October, 1970 did O'Brien decide to terminate his assignment as an undercover agent and become a corrupt police officer and a member of the "pad". In my opinion, the trial court properly instructed the jurors that they were to find O'Brien was an accomplice as a matter of law "at the very latest, some time in mid or late October of 1970", the month in which, according to his testimony, he committed illegal acts, but that it was up to them to determine whether he was an accomplice prior to that date.

On January 10, 1972, when Buchalski was brought to the District Attorney's office and agreed to co-operate with the investigation in exchange for the District Attorney's offer of immunity, any possible prosecution for this criminal activity ceased. From that day forward, while acting as an agent of the District Attorney's office, Buchalski no longer had a motive "to share his guilt with others such as appellants." He faced no criminal prosecution and all of his actions from that time forward were not those of an accomplice. Consequently, his testimony identifying the voices of the 10 appellants on the tape recordings needed no corroboration.

I therefore can see no reason why the testimony of these officers should not have been heard and weighed by the jury as the testimony of nonaccomplice witnesses to the events which occurred during that period.

An additional reason for affirming the convictions of appellants Reitano, Maroney, Brown, Carter, Conti and Auletta is that at no stage of the trial did these appellants register a protest to the trial court's instruction to the jury that, as a matter of law, Buchalski was an accomplice as to all transactions and observations to which he testified which occurred *prior* to January 10, 1972. They made no requests and took no objection to the trial court's failure to instruct the jury that Buchalski was an accomplice after January 10, 1972. These appellants are therefore precluded from raising the issue on this appeal. Certainly, the interest of justice does not require a different result.

MARGETT and O'CONNOR, JJ., concur with TITONE, J.; RABIN, J., concurs in part and dissents in part, with an opinion, in which LATHAM, J. P., concurs.

Appeal by defendant McDaniel from a judgment of the Supreme Court, Kings County, rendered October 3, 1973, dismissed and action remanded to the Criminal Term for the purpose of vacating the judgment.

Four judgments of the same court, all rendered October 3, 1973, one as against each of the defendants Melnick, White, Bergold and Fortuna, affirmed.

Eleven judgments of the same court, all rendered October 3, 1973, one as against each of the defendants Reitano, Maroney, Brown, Conti, Carter, Cona, Auletta, Zummo, Mattina, Callis and Greene, reversed, on the law, and indictments as against said defendants dismissed.

This case is remitted to the Supreme Court, Kings County, for further proceedings pursuant to CPL 460.50 (subd 5) (as to defendants Melnick, White, Bergold and Fortuna) and for the purpose of entering an order in its discretion pursuant to CPL 160.50 (as to defendants Reitano, Maroney, Brown, Conti, Carter, Auletta, Zummo, Mattina, Callis, Cona and Greene).