■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PETER CONLON, Appellant.—Appeal by defendant from a judgment of the County Court, Westchester County, rendered December 16, 1977, convicting him of burglary in the second degree, grand larceny in the second degree and criminal possession of stolen property in the first degree, upon a jury verdict, and imposing sentence. Judgment reversed, on the law, and new trial ordered. The major issue on this appeal is whether the trial court erred in refusing to charge that one William Apy was, as a matter of law, an accomplice of the defendant. The evidence adduced at trial showed that on the evening of May 8, 1976, Lori Hemings, Robert Apy and the defendant drove to a house in the Hamlet of Vista. While Hemings waited in the car, Apy and the defendant broke into the house and removed jewelry and various pieces of silver. Later that night, the trio drove to the home of William Apy, Robert's brother, where they inspected the stolen items in William's presence. Two days later, the defendant, Hemings and Robert Apy went to a store called Raphael's of London for the purpose of selling silver pieces. After the defendant informed the proprietor that the silver was from his grandfather's estate, the two agreed upon a sale price of $2,500 and the defendant was given a check for that amount. Later that day, the defendant's mother informed him that Mr. Raphael had called to confirm whether the silver was actually from his grandfather's estate. She told Raphael that she would get back to him after she spoke with the defendant. The defendant informed his mother that Robert Apy's parents had given the silver to Robert, who did not want Raphael to know that it belonged to him. In a telephone conversation between William Apy, posing as Robert's father, and the defendant's mother, William verified the story that the silver

belonged to Robert. William also called Mr. Raphael, this time posing as the defendant's father, and confirmed what the defendant had told him regarding the source of the silver. The following morning the defendant indorsed the check and gave it to William Apy, who attempted to cash it at his own bank. The bank refused payment because William had insufficient funds in his account. Eventually, the defendant and Hemings found a way to cash the check. Upon these facts we find that the trial court erred in refusing to charge, as a matter of law, that William Apy was an accomplice. The term "accomplice" is statutorily defined, *inter alia,* as any individual who "may reasonably be considered to have participated in * * * An offense based upon the same or some of the same facts or conduct which constitute the offense charged" (CPL 60.22, subd 2, par [b]). The intent of paragraph (b) is to include persons " 'who are *in some way* criminally implicated in, and possibly subject to, prosecution for the general conduct or factual transaction on trial' " *(People v Cona,* 60 AD2d 318, 324 [emphasis in original]). The statute broadens the definition of an accomplice "in order to provide a more equitable, operable and consistent standard for the courts in determining when the requirement of corroboration is applicable" *(People v Basch,* 36 NY2d 154, 157; *People v Cona, supra; People v Werner,* 55 AD2d 317). Applying this rationale to William Apy, it is evident that he actively participated in an endeavor to hinder discovery of the burglary through his calls to the defendant's mother and Raphael. Furthermore, he attempted to cash the check that the defendant had received in return for the stolen goods. Thus, there was an evidentiary showing that William was implicated in the criminal transaction sufficient to warrant the instructions sought. Clearly, William was subject to possible prosecution for his conduct. We have considered the defendant's other contentions and find them to be without merit. With regard to the issue of double jeopardy expounded upon by our learned dissenting brother, we would note, as indicated in the dissent, that the Trial Judge, in referring to the conduct of the prosecutor, found that there was no evidence whatsoever of "any intentional or bad faith action on his part." Mollen, P. J., Hopkins, Hawkins and O'Connor, JJ., concur.

Titone, J., concurs as to the reversal of the judgment but otherwise dissents and votes to dismiss the indictment, with the following memorandum: In my opinion the action of the prosecutor at the first trial in triggering a mistrial by asking the defendant's mother improper questions should have barred the instant retrial. The defendant was charged with burglarizing a home in Katonah, Westchester County, with two others and stealing certain items of silverware and jewelry, worth a substantial amount of money. Before commencement of the first trial, evidence was adduced at a *Sandoval* hearing that some years earlier the defendant had pleaded guilty to the crime of attempted possession of a controlled substance (marihuana) in the fourth degree. The trial court, in its ruling prohibiting the People from using either the drug conviction or the underlying facts of the crime, stated, *inter alia:* "All references to drugs of any kind, including * * * possessing * * * that is all out." After the People presented three witnesses on its direct case, the defense began its case by calling the defendant's mother, Joan Conlon. In her direct testimony, encompassed in just six pages of the trial transcript, she mentioned that the defendant lived with her, and recounted the gist of two telephone conversations, one with the person who purchased the stolen silverware and the other with the brother of an alleged accomplice. Nothing testified to by her on direct examination could be considered as character testimony. Despite the limited scope of her testi-

mony on direct, on cross-examination the prosecutor, almost immediately, delved into the personal relationship between the witness and her son, as is evidenced by the following excerpt from the transcript: "Q Isn't it a fact that at that time Peter and yourself were having a little problem about his lifestyle? A We have, from time to time. Q Not from time to time. Back then in May of 1976?" After an objection by defense counsel, and an observation by the trial court that "generation gaps are no surprise to any of us", the prosecutor was permitted to continue. He asked the defendant's mother the following question and received the following answer: "Q Didn't Peter have a problem back then? A I don't understand what you mean by a problem." Although defense counsel again objected, the prosecutor, *without* waiting for a ruling asked the following question which precipitated a granting of defense counsel's motion for a mistrial: "Was he using narcotics?" In my opinion the trial court's reasons for granting the mistrial were unassailable. It correctly noted that the defense had been extremely careful during the direct examination of Mrs. Conlon to avoid the issue of the defendant's character and reputation and opened no doors to make questions in that regard permissible on cross-examination. It also pointedly observed that a question as to the defendant's prior use of narcotics would be impermissible even on cross-examination of him, under the *Sandoval* ruling, and therefore was impermissible on cross-examination of the defendant's mother. However, I disagree both with the trial court's denial of defendant's subsequent motion to bar a second trial and dismiss the indictment on the ground of double jeopardy, and the reasons given for such denial. According to the trial court, although the prosecutor made "a serious mistake" in asking Mrs. Conlon about the defendant's use of narcotics, there was no evidence at all of "any intentional or bad faith action on his part", and in the absence of such a finding, double jeopardy did not attach. In my opinion, the action of the prosecutor in asking the fatal question constituted more than a "serious mistake". Normally double jeopardy does not attach as a result of a mistrial granted on motion of a defendant. However, the rule is otherwise where a defendant's motion for a mistrial and the granting thereof are triggered either by intentional provocation on the part of a prosecutor, or the prosecutor's gross negligence (see *United States v Dinitz*, 424 US 600; *United States v Martin*, 561 F2d 135 [8th Cir]; *United States v Kessler*, 530 F2d 1246 [5th Cir]). A defendant's initiation of a mistrial motion does not prevent his successful assertion that he was twice placed in jeopardy if there was either gross negligence or intentional misconduct *(United States v Kessler, supra)*. If "prosecutorial overreaching" is found, a second trial is barred by the double jeopardy clause, notwithstanding the fact that the defendant requested the mistrial *(United States v Kessler, supra)*. In the instant situation, it is manifest that the prosecutor, under the inhibiting ruling of the trial court after the *Sandoval* hearing, was obligated to forbear adducing evidence concerning defendant's prior involvement with drugs. However despite such obligation, the prosecutor, on cross-examination of Mrs. Conlon, did not ask one question of her pertaining to matters brought out on direct but delved immediately into the defendant's use of narcotics. Even in the absence of the *Sandoval* ruling, the prosecutor would not normally be permitted to ask about specific acts of the defendant's misconduct (Richardson, Evidence [10th ed], § 498). That the prosecutor was desirous of terminating the first trial via the mistrial route is evidenced by the fact that the testimony of the People's only witness, a female accomplice, who directly implicated defendant in the burglary, was seriously weakened and damaged (1) by her admissions that she had been a user of heroin and

had been involved in two other thefts, and (2) by multiple and serious contradictions between her testimony on direct and cross-examination, and between her trial and Grand Jury testimony. Based on the above facts set forth in the record, I conclude that the prosecutor either purposely asked Mrs. Conlon about the defendant's use of narcotics in order to produce a mistrial, or at the very least, demonstrated a gross disregard of the *Sandoval* ruling and the duty of every prosecutor, as an officer of the court, to accord an accused a fair trial. Therefore, I vote to reverse and dismiss the indictment.