THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ROCCO D. POTENZA, Appellant.

Fourth Department, February 28, 1983

**APPEARANCES OF COUNSEL**

*Lipsitz, Green, Fahringer, Roll, Schuller & James* (*Paul
J. Cambria* and *Robert M. Murphy* of counsel; *Mary Good*
on the brief), for appellant.

*Richard J. Arcara, District Attorney* (*John DeFranks* and
*Kurt T. Sajda* of counsel), for respondent.

**OPINION OF THE COURT**

HANCOCK, JR., J.

Defendant, formerly a lawyer in Buffalo, was convicted
after a nonjury trial of bribing Richard M. Mancuso, an
Erie County Assistant District Attorney, in connection
with a consumer fraud case involving defendant's clients.
The principal witness against defendant was his accom-
plice, Mancuso, who had pleaded guilty to bribery in other
matters. At issue is whether the evidence offered to corrob-
orate the testimony of the accomplice Mancuso, chiefly

taped recordings of two conversations between defendant and Mancuso, meets the requirement of CPL 60.22 that it "tend * * * to connect the defendant with the commission of [the] offense" of bribery, second degree. Defendant does not dispute that he took part in the conversations or that the tapes accurately reflect them. Rather, he points out that portions of the conversations are susceptible to an interpretation consistent with his innocence and urges that, particularly when viewed in light of his exculpatory testimony, they do not satisfy CPL 60.22. We hold that the court could properly find sufficient corroboration in the conversations themselves and in defendant's explanations thereof, which, if deemed unworthy of belief, can support an inference of guilt.

Here, the crime to the commission of which defendant must be linked is bribery: a crime which, if it was committed at all, was committed by defendant. Thus the proof required under CPL 60.22 must do more than tie the defendant to the transaction in which the bribe is said to have occurred (see *People v Morhouse,* 21 NY2d 66, 75; *People v Fiore,* 12 NY2d 188, 201; *People v Mullens,* 292 NY 408, 416). There must also be proof independent of the accomplice's testimony of words and actions of the defendant tending to show that the bribe did occur, i.e., tending to show that defendant "offer[ed] to a public servant a benefit to induce him 'to act or refrain from acting in a matter over which he may be assumed to have power' *(People v Chapman,* 13 NY2d 97, 101)" *(People v Graham,* 57 AD2d 478, 482, affd 44 NY2d 768). The evidence, we find, meets this test.

There is little difference between the testimony of Mancuso and defendant with respect to the factual background. In June, 1977 Mancuso was the Assistant District Attorney in charge of the Consumer Fraud Bureau. As a lawyer with 25 years of experience, defendant had in the past represented clients in criminal fraud cases involving household repairs. He and Mancuso were friends and had at one time shared office space. The matter giving rise to the bribery charge involved the possible prosecution of defendant's clients Frustino, Westfall and Palmer in connection with $9,000 paid to them for household repairs by

an 84-year-old woman in Cheektowaga, Mabel Hartung. That he and Mancuso held discussions concerning the resolution of the Hartung matter defendant does not deny.

Mancuso testified that on June 2, 1977 defendant called him on the telephone and requested an immediate meeting on the Hartung case at defendant's office. At the meeting, which took place a few days later in the Chemical Bank Building, defendant asked him to send out target letters[1] to his clients and told him that if he did so, he would make it "economically worthwhile". Mancuso agreed. In a follow-up phone conversation on June 7, Mancuso advised defendant that the target letters would probably go out, that his clients should not testify and that "they'll probably beat it." Defendant told Mancuso that he would have the money for him later in the week. The "scenario" for resolving the matter, as Mancuso described it, included the sending out of target letters to "serve as a spur" to defendant's clients and the ultimate resolution of the case without criminal prosecution in a civil compromise. Although the target letters were prepared, there is no proof that they were sent out. Some time after June 7 Mancuso received $1,000 in cash in a plain white envelope at defendant's office from Lynn Licata, defendant's secretary. On or about June 23, Mancuso prepared separate letters on the District Attorney's stationery addressed to Mabel Hartung and to defendant and a memorandum to the District Attorney, all of which recited his conclusion that the facts did not warrant a prosecution of defendant's clients for criminal fraud.

Defendant agrees that on June 2, after Frustino contacted him, he called Mancuso and asked him to come to his office. Mancuso, however, did not appear. On the next day, June 3, he met with Mancuso and with Assistant District Attorney Herter at Mancuso's office and succeeded in working out a civil compromise. He never asked Mancuso to send out target letters, he said, and, moreover, he didn't know what a target letter was. Neither he nor his secretary, Lynn Licata, gave Mancuso $1,000; nor did he ever promise to make such a payment. The references to money in the conversation of June 7, he explained, were

---

1. A target letter according to Mancuso's testimony is a letter to advise a person that he or she might become a target of an investigation or prosecution.

not to a payment to be made to Mancuso but to the sum to be received from his clients and paid to the representative of Mabel Hartung for the civil compromise. Lynn Licata testified that at no time in June of 1977 did she deliver anything contained in a white envelope to Mancuso.

Mancuso and defendant agree that their first contact on the Hartung matter was on June 2, 1977, the first of four taped conversations,[2] which follows:

"Potenza: Richard?

"Mancuso: Yeah. I called you yesterday.

"Potenza: Yeah, I know you did. I saw the message. I called you ah — you remember those guys, those guys I told you about that were in that business?

"Mancuso: Michaels?

"Potenza: Yeah.

"Mancuso: Yeah, they conveniently got in trouble.

"Potenza: A spin off. Ah — something going on up in Cheektowaga? Did you hear anything about it?

"Mancuso: Yeah, yeah sure did. Zablotny called me on it.

"Potenza: Oh yeah?

"Mancuso: Yeah.

"Potenza: What's going to happen?

"Mancuso: Wait a minute (puts on hold — talks to someone in the background).

---

2. Four conversations were taped: June 2, June 7, June 9, and June 23. Defendant failed to preserve his objection raised for the first time on review, that the tapes were not properly sealed pursuant to CPL 700.50 (subd 2) (see *People v Narayan*, 54 NY2d 106, 112). Moreover, defendant makes no claim that the tapes have been altered or tampered with. We reject defendant's contention that the record is incomplete because the transcript fails to reflect what portions of the tapes were played in court during the trial; the entire contents of the tapes were admitted into evidence and are part of the record thus permitting complete review. Defendant concedes that the voices on the tapes are his and Mancuso's. There is no contention that the tapes are inaudible. Indeed, defendant and the People, except for minor discrepancies, agree on the contents of the two crucial conversations which they set forth in their briefs. We have set forth herein our transcriptions of the June 2 and June 7 conversations and note that they, except for insignificant differences, duplicate defendant's versions. Because the tapes of June 9 and June 23 are of peripheral interest, we have not found it necessary to include herein transcriptions of them.

"Mancuso: Yeah Rock?

"Potenza: Yeah.

"Mancuso: Um — I told them to, what the hell, when he called me, he mentioned it. I told him to call me back, to lay ah to get the old broad, and lay an information on it.

"Potenza: Well, all right. That's, good.

"Mancuso: Because he —

"Potenza: But, I would like to see you.

"Mancuso: Yeah, yeah well I could —

"Potenza: I won't come over there. I want you to come over here.

"Mancuso: Okay.

"Potenza: Come on over. Come on over now.

"Mancuso: Alright.

"Potenza: Have a cup of coffee.

"Mancuso: All right. I, I'm waiting for a guy now to pay off his mortgages. As soon as I am done with him I'll shoot over.

"Potenza: Okay.

"Mancuso: Okay?

"Potenza: All right. Okay.

"Mancuso: But ah — I told Vince Zablotny that this might merit a direct presentation".

In his testimony defendant conceded that the references to "those guys * * * that were in that business" and to "Michaels" were intended to signify to Mancuso the type of matter that he was calling about: i.e., a criminal case involving home improvement fraud. His inquiry about "something going on up in Cheektowaga" admittedly was about the Hartung complaint which he understood was being investigated by Officer Zablotny. By "the old broad" he knew Mancuso meant Mabel Hartung.

Defendant acknowledged that he interjected: "Well, alright. That's, that's good" when told that Mancuso had directed Zablotny to "get the old broad, and lay an information on it." The reason for his reaction, defendant said, was his thought that the case would then be in a local court where it would be easier to have a civil compromise approved.

The telephone conversation of June 7 follows:

"Potenza: How are things going up there in (pause) Pole country?

"Mancuso: Cold country?

"Potenza: Pole, Pole, Pole country.

"Mancuso: I don't know if I'm following this. Oh, yes, as a matter of fact, they're coming in to see me.

"Potenza: Well that's good. I'll have the ... medicine for that person. (the voices run together — Potenza's voice inaudible)

"Mancuso: I'll tell you why. There seems to be a problem with it. Chris Belling called to say they really want to go ahead, but there's some legal problems.

"Potenza: Like what?

"Mancuso: The old lady who she actually recognizes and so on. So probably target letters will go out. But if these guys don't testify they'll probably beat it, but, you follow me.

"Potenza: Well then I shouldn't take the medicine.

"Mancuso: Oh yeah. Oh sure.

"Potenza: I want to make sure that — I can't take it, and have them coming back.

"Mancuso: What do you mean? Oh, no, no, no.

"Potenza: You sure.

"Mancuso: Sure. I'm telling you the scenario of this thing. The best way to do it.

"Potenza: I'll have a — I'll have that thing for you, you know later this week.

"Mancuso: Yeah, have it because I'm going to see [him?]

"Potenza: Oh, absolutely.

"Mancuso: Draft up what should be done, and so —

"Potenza: Later this week.

"Mancuso: Okay.

"Potenza: All right.

"Mancuso: Keep in touch."

In the opening question: "How are things going up there in Pole country?", both participants agree that they understood the inquiry to be about Cheektowaga and the Hartung case. In telling Mancuso: "I'll have the ... medicine for that person" and in the comments "[w]ell then I shouldn't take the medicine" and "I can't take it, and have them coming back", defendant maintained that he was alluding to the civil compromise he said was reached on June 3 at the District Attorney's office. Mancuso's understanding, on the other hand, was that "medicine for that person" meant money coming to him for sending out the target letters and for obstructing the prosecution; and that when defendant said that he "shouldn't take the medicine" and then have his clients "coming back", he was talking about the legal fee his clients were to pay for the successful resolution of the matter. In telling Mancuso that he would "have that thing for you, you know later this week", defendant said he was referring to tickets (for a Sheriff's picnic, political dinner or some similar event) which he had promised Mancuso. Mancuso, however, understood the word "thing" to mean money for him. By "[d]raft up what should be done", defendant assumed that Mancuso was talking about the papers for the civil compromise. According to Mancuso, he was speaking of the preparation of the target letters.

In weighing the sufficiency of the taped conversations as corroboration under CPL 60.22, we note first that contrary to defendant's assertion, the proof need not tend to connect him with the actual payment of the money, for the crime of bribery is complete when the offer is made (see Penal Law, § 200.00; *People v Arcadi,* 79 AD2d 845, 846, affd 54 NY2d 981; *People v Graham,* 57 AD2d 478, 482, affd 44 NY2d 768, *supra,* quoting *People v Chapman,* 13 NY2d 97, 101, *supra*). Corroborative evidence "need not itself prove commission of the crime. Rather, it is sufficient if * * * [it] tends to connect the defendant to the crime so as to reasonably satisfy the [trier of the fact] that the accomplice is telling the truth"[3] (*People v Glasper,* 52 NY2d 970, 971,

**3.** CPL 60.22 as applied by the courts requires "some" corroboration of accomplice testimony (see 3 Wharton, Criminal Evidence [13th ed], § 649, p 369, and cases cited therein), and it "need not be much" (Bellacosa, Practice Commentary, McKinney's Cons

citing *People v Cunningham,* 48 NY2d 938, 940). The proof "may not depend for its weight and probative value upon the testimony of the accomplice" (*People v Hudson,* 51 NY2d 233, 238, citing *People v Kress,* 284 NY 452, 460). Here, then, we must assess the probative worth of the corroboration without reference to Mancuso's testimony concerning the meeting in his office or to his interpretation of the taped conversations.

Given their conceded context as part of continuing discussions about the potential prosecution of defendant's clients, the taped conversations, taken alone and unexplained, indicate that defendant had offered a bribe to Mancuso for his part in the "scenario", i.e., sending out the target letters and "fixing" the case (cf. *People v Cona,* 60 AD2d 318, 325-326, mod 49 NY2d 26, 32, n 1; *People v Goldfeld,* 60 AD2d 1, 7). Indeed, defendant's rejoinder: "I'll have that thing for you, you know later this week" (after Mancuso had told him that the target letters would probably go out and that if his clients didn't testify they would "probably beat it") could itself be construed without more as sufficient evidence of a separate offer or assurance of a bribe (cf. *People v Cona, supra; People v Goldfeld, supra,* p 7). And one could reasonably conclude, we believe, that defendant was talking about money coming from someone to be given to someone — and not about medicines or prescriptions — when he said: "I'll have the ... medicine for that person", and "[w]ell then I shouldn't take the medicine." Moreover, the tapes themselves contain telling proof of defendant's efforts to keep the matter secret. He never mentioned Mabel Hartung or the names of his clients but instead made cryptic references to the case such as "something going on up in Cheektowaga"; and he insisted that the meeting to discuss the matter not be in the office of the District Attorney but in his private law office. Such seem-

Laws of NY, Book 11A, CPL 60.22, p 442; see, generally, *People v Smith,* 55 NY2d 945; *People v Glasper,* 52 NY2d 970; *People v Hudson,* 51 NY2d 233). The State Legislature has rejected the Federal rule, adopted in some States, that a defendant may be convicted upon the uncorroborated testimony of an accomplice, provided that the jury is properly instructed (see *People v Cona,* 49 NY2d 26, 45; Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 60.22, p 442). The purpose of section 60.22 is to insure that the "conviction will not rest entirely upon the evidence of the accomplice" (Criminal Procedure in NY, Pt II [3d ed], § 17:03, citing *People v O'Farrell,* 175 NY 323), who "may be motivated by self-preservation" (4 Zett, NY Crim Prac, par 27.5 [2], p 27-47; see *People v Hudson, supra,* p 238; *People v Daniels,* 37 NY2d 624, 629-630).

ingly clandestine conduct, if accepted as evidence of guilt, could also be considered as corroboration under CPL 60.22 (see *People v Glasper,* 52 NY2d 970, *supra).*

But in the trial defendant did not rest his case on the ambiguity of the unexplained tapes and their claimed inadequacy under CPL 60.22; for he chose to explain them as innocent conversations between a defense lawyer and a District Attorney concerning a civil compromise. He argues that since his version of the conversations, as related in his testimony, supports his innocent interpretation of the entire transaction, the tapes cannot supply adequate corroboration because the only contrary version is that found in Mancuso's testimony which the court may not consider (see *People v Hudson,* 51 NY2d 233, 238, *supra).* We disagree. It is fundamental that to furnish corroboration the evidence "need not be inconsistent with a theory under which the defendant would be innocent" (*People v Morhouse,* 21 NY2d 66, 75, *supra,* citing *People v Mullens, supra;* see *People v Smith,* 55 NY2d 945, 946; *People v Daniels,* 37 NY2d 624, 630; *People v Kohut,* 30 NY2d 183, 193-194). Thus, the court could properly have accepted as corroborative of the bribe even those portions of the conversations which appear to be consistent with the alleged civil compromise; and since defendant has elected to give his version of the tapes and thereby put his credibility in issue, we may unquestionably consider the plausibility of his interpretations in deciding whether the court was justified in rejecting them (see, generally, *People v Dixon,* 231 NY 111, 116). For example, despite defendant's assertion that by "medicine" he meant money for settlement and by "that thing" he meant tickets, the court could from a commonsense analysis of the conversation and its context in the total transaction have reached the only other logical conclusion, i.e., that defendant meant bribe money.

Defendant's own testimony furnishes ample grounds for discrediting his version. He could offer no satisfactory answers to: why he and Mancuso used veiled references to the case, to his clients, and to whatever money was to change hands; why, if the civil compromise had been

worked out with Mancuso on June 3 as defendant claimed, Mancuso on June 7 was still talking about a possible criminal prosecution and defendant's clients' "beating it"; why on June 2 defendant said "that's good" when Mancuso told him that Zablotny was going to "lay an information" in the matter;[4] why defendant would call tickets "that thing" on June 7 and refer to tickets as tickets two days later;[5] and, indeed, why the June 7 conversation was necessary at all if, as claimed, all that remained to be done was to "draft up" the compromise papers. Moreover, the court, we think, could have found it most improbable that an experienced criminal lawyer would not "know what [Mancuso] was talking about" when Mancuso said "target letters will go out * * * [b]ut if these guys don't testify they'll

---

**4.** Portions of the cross-examination of defendant concerning this response are as follows:

"Q. And, 'Lay an information on it,' you heard him say that?

"A. Yes, I did.

"Q. And did you understand that to mean that the Cheektowaga Police would get a Complaint from Mabel Hartung and file it against Phillip Frustino in Cheektowaga?

"A. Probably.

"Q. Okay. And your reaction to that was, 'That's good'?

"A. No, my reaction to that, if you play that tape again, is I — I hesitated because I really didn't know what he was talking about * * *

"Q. You were so confused you said, 'All right, that's good'?

"A. I didn't know what else to say * * *

"Q. Well, let me ask you this. When you say, 'That's good,' was that good for you?

"A. Well, there's a couple of interpretations you can give to it * * *

"Q. Was it any benefit to Philly Frustino to be charged out in the Town of Cheektowaga?

"A. There might be, might be easier to dispose of the matter.

"Q. Well, why were you calling Richard Mancuso downtown then?

"A. Because I thought that he was the head of the Bureau, anything that went through would have to go through him."

**5.** In the June 9 conversation, defendant said to Mancuso, "Tomorrow I'll have those tickets." When cross-examined on this point defendant testified as follows:

"Q. Then you said, 'Thing,' you meant tickets, right?

"A. Right.

"Q. Now, is there some reason why you — you used the word — you called tickets, 'Thing,' on June 7th?

"A. I don't know, I guess I just call tickets things.

"Q. June 9th, you had no reservations about calling tickets tickets, right?

"A. That's right.

"Q. But now, and there's no question that you said, 'Thing,' not things, plural, right * * *

"A. Obviously, I said thing.

"Q. But, June 9th, you had tickets?

"A. That was the thing."

probably beat it * * * you follow me" or that defendant had "never heard the expression, 'target letters'". This testimony if regarded as false explanations evincing guilt could amount to additional corroboration of the accomplice's version of events (see, generally, *People v Glasper*, 52 NY2d 970, 972, *supra; People v Ruberto*, 10 NY2d 428, 430; *People v Dixon, supra,* p 116; *People v Becker*, 215 NY 126, 140; *People v Moses,* 91 AD2d 239).

On this record, we find sufficient independent corroborative evidence to warrant consideration of the question of guilt by the fact finder (see *People v Fiore,* 12 NY2d 188, 201, *supra*).

We hold also that the record supports the verdict. Mancuso's testimony concerning the transaction and his interpretation of the taped conversations corroborated by the conversations themselves plus defendant's implausible explanations thereof all supply an adequate basis for a finding beyond a reasonable doubt that defendant was guilty of bribery (see Penal Law, § 200.00).

We conclude that the hearing court properly denied the CPL 30.30 motion for the reasons expressed in its oral decision (see *People v Cole,* 90 AD2d 27). We find no basis for reversal in the other points raised on appeal. The judgment should be affirmed.

CALLAHAN, DENMAN, BOOMER and MOULE, JJ., concur.

Judgment unanimously affirmed.